No. 23-50167

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

Children's Health Defense; Deborah L. Else; Sacha Dietrich;
Aimee Villella McBride; Jonathan Shour; Rebecca Shour,

Plaintiffs-Appellants,

v.

Food & Drug Administration; Robert M. Califf,

Defendants-Appellees.

On Appeal from the United States District Court
for the Western District of Texas

## BRIEF FOR APPELLEES

*Of Counsel:*

SAMUEL BAGENSTOS
*General Counsel, Department of Health and*
*Human Services*

MARK RAZA
*Chief Counsel*

WENDY VICENTE
*Deputy Chief Counsel, Litigation*

JAMES ALLRED
*Associate Chief Counsel*

*U.S. Food and Drug Administration*

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney*
*General*

JAIME ESPARZA
*United States Attorney*

DANIEL TENNY
SEAN R. JANDA
*Attorneys, Appellate Staff*
*Civil Division, Room 7260*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3388*

## STATEMENT REGARDING ORAL ARGUMENT

Appellees do not believe that oral argument is necessary in this case.

Nevertheless, if the Court believes that oral argument would be of assistance, the government stands ready to present argument.

# TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION ................................................................1

STATEMENT OF THE ISSUES...................................................................1

PERTINENT STATUTES AND REGULATIONS ......................................2

STATEMENT OF THE CASE......................................................................2

      A.   Statutory and Regulatory Background...............................................2

      B.   Factual and Procedural Background...................................................3

SUMMARY OF ARGUMENT.....................................................................8

STANDARD OF REVIEW ........................................................................ 11

ARGUMENT .............................................................................................. 11

I.     Plaintiffs Lack Standing to Pursue Their Claims ................................ 11

      A.   The Individual Plaintiffs Have Not Alleged Sufficient Injury-in-Fact.......12

      B.   Even if the Individual Plaintiffs Could Show Injury-in-Fact, Their Injuries Would Not Be Traceable to FDA or Redressed by a Favorable Decision.........................................................................17

      C.   Children's Health Defense Lacks Organizational Standing.........................24

II.    In Any Event, the Relevant Actions Are Committed to Agency Discretion by Law....................................................................... 27

CONCLUSION ........................................................................................... 29

 CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                                          **Page(s)**

*Association of Am. Physicians & Surgeons v. FDA,*
  No. 20-1784, 2020 WL 5745974 (6th Cir. Sept. 24, 2020) ......................................... 28

*Baur v. Veneman,*
  352 F.3d 625 (2d Cir. 2003) ............................................................................... 15

*Bennett v. Spear,*
  520 U.S. 154 (1997) .................................................................................... 9, 18

*Booth v. Bowser,*
  597 F. Supp. 3d 1 (D.D.C. 2022) ..................................................................... 14

*Center for Food Safety v. Price,*
  No. 17-cv-3833, 2018 WL 4356730 (S.D.N.Y. Sept. 12, 2018) ................................ 15

*Children's Health Def. v. U.S. FDA,*
  No. 21-6203, 2022 WL 2704554 (6th Cir. July 12, 2022), *cert. denied,*
  143 S. Ct. 784 (2023) ................................................................................. 20, 23

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) .......................................................................................... 12

*Cutler v. Kennedy,*
  475 F. Supp. 838 (D.D.C. 1979) ........................................................................ 15

*Ellison v. Connor,*
  153 F.3d 247 (5th Cir. 1998) ............................................................................. 27

*E.T. v. Paxton,*
  41 F.4th 709 (5th Cir. 2022) ..............................................................................20

*Inclusive Cmtys. Project, Inc. v. Department of Treasury,*
  946 F.3d 649 (5th Cir. 2019) ...................................................................19, 20, 23

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ............................................................... 9, 11, 18, 22, 27

*NAACP v. City of Kyle*,
  626 F.3d 233 (5th Cir. 2010) ............................................................... 24, 25, 26

*New York Public Interest Research Grp. v. Whitman*,
  321 F.3d 316 (2d Cir. 2003) ......................................................................... 15

*Null v. U.S. FDA*,
  No. 09-cv-1924, 2009 WL 10744069 (D.D.C. Nov. 10, 2009) ................................. 21

*Online Merchs. Guild v. Cameron*,
  995 F.3d 540 (6th Cir. 2021) ......................................................................... 26

*Owens v. Circassia Pharm., Inc.*,
  33 F.4th 814 (5th Cir. 2022) .......................................................................... 16

*Rivera v. Wyeth-Ayerst Labs.*,
  283 F.3d 315 (5th Cir. 2002) .......................................................................... 19

*Shemwell v. City of McKinney*,
  63 F.4th 480 (5th Cir. 2023) .......................................................................... 11

*Simon v. Eastern Ky. Welfare Rights Org.*,
  426 U.S. 26 (1976) ...................................................................................... 13

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998) ...................................................................................... 26

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ..................................................................................... 27

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021) ............................................................................. 11, 16

*Tummino v. Torti*,
  603 F. Supp. 2d 519 (E.D.N.Y. 2009) ............................................................... 15

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State*,
  454 U.S. 464 (1982) ..................................................................................... 17

**Statutes:**

Administrative Procedure Act:
    5 U.S.C. § 551 *et seq.* ................................................................. 1
    5 U.S.C. § 701(a)(2) ................................................................ 10

Public Health Service Act:
    42 U.S.C. § 247d ...................................................................... 3
    42 U.S.C. § 262(a)(1)(A) ......................................................... 2
    42 U.S.C. § 262(a)(2)(C) ......................................................... 2
    42 U.S.C. § 262(i)(1) ................................................................ 2

21 U.S.C. § 360bbb-3 ............................................................ 3, 10

21 U.S.C. § 360bbb-3(a)(1) ......................................................... 2

21 U.S.C. § 360bbb-3(b) ............................................................ 28

21 U.S.C. § 360bbb-3(b)(1) .......................................................... 2

21 U.S.C. § 360bbb-3(c) ............................................................ 28

21 U.S.C. § 360bbb-3(c)(1) ........................................................... 3

21 U.S.C. § 360bbb-3(c)(2) ........................................................... 3

21 U.S.C. § 360bbb-3(i) ..................................................... 3, 11, 28

28 U.S.C. § 1291 ........................................................................... 1

28 U.S.C. § 1331 ........................................................................... 1

28 U.S.C. § 1361 ........................................................................... 1

Fla. Stat. § 1014.06(1) ................................................................ 13

N.C. Gen. Stat. § 90-21.5(a1) ...................................................... 13

Tex. Family Code Ann. § 32.101(b) ............................................. 13

Tex. Family Code Ann. § 151.001(a)(6) ....................................... 13

**Rule:**

Fed. R. App. P. 4(a)(1)(B) ........................................................... 1

**Other Authorities:**

FDA, Comirnaty Prescribing Information, https://perma.cc/M524-ZZ9X ................ 5

FDA, *Emergency Use Authorization*, https://perma.cc/XKQ8-GUBN ......................... 4

FDA, EUA Decision Memorandum (Aug. 19, 2022),
    https://perma.cc/J3MV-6KDC ........................................................... 5

FDA, *FDA COVID-19 Vaccine News and Updates*,
    https://perma.cc/E3VU-JDWF ........................................................... 6

FDA News Release, *Coronavirus (COVID-19) Update: FDA Authorizes
    Changes to Simplify Use of Bivalent mRNA COVID-19 Vaccines*
    (Apr. 18, 2023), https://perma.cc/WY2V-YLYU ....................................... 6

FDA News Release, *FDA Approves First COVID-19 Vaccine*
    (Aug. 23, 2021), https://perma.cc/5Q5J-GP9H ......................................... 5

FDA News Release, *FDA Takes Key Action by Approving Second
    COVID-19 Vaccine* (Jan. 31, 2022), https://perma.cc/K65B-ZDYY ......................... 5

FDA, Spikevax Prescribing Information, https://perma.cc/BNQ6-ANWK ............... 5

85 Fed. Reg. 7316 (Feb. 7, 2020) ........................................................... 3

85 Fed. Reg. 18,250 (Apr. 1, 2020) ........................................................... 3

86 Fed. Reg. 5200 (Jan. 19, 2021) ........................................................... 4

86 Fed. Reg. 28,608 (May 27, 2021) ........................................................... 5

86 Fed. Reg. 52,790 (Aug. 29, 2022) ........................................................... 5

Letter from Peter Marks, M.D, Ph.D., Director, Center for Biologics
    Evaluation and Research, to Janssen Biotech, Inc. (June 1, 2023),
    https://perma.cc/J676-XE42........................................................... 5

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction in this suit, brought under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, under 28 U.S.C. §§ 1331, 1361. ROA.1910. As explained below, the district court lacked jurisdiction over plaintiffs' claims because plaintiffs do not have standing to sue and the relevant agency actions are committed to agency discretion by law. *See infra* pp. 11-28. The district court dismissed plaintiffs' complaint on January 12, 2023. ROA.2430. Plaintiffs timely appealed on March 3, 2023. ROA.2446; *see* Fed. R. App. P. 4(a)(1)(B) (60-day time limit). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

Plaintiffs are five individuals and one organization who challenge the U.S. Food and Drug Administration's (FDA) issuance of emergency use authorizations that cover administering COVID-19 vaccinations to children aged six months to eleven years. Neither the individual plaintiffs, their children, nor any identified members of the organization are subject to any vaccination mandates or otherwise directly affected by FDA's conduct. The individual plaintiffs nonetheless assert that they fear that some third party may vaccinate their children over their objections and that they have been harassed and exposed to pro-vaccine propaganda from various third parties, and the organization claims that it has diverted resources on account of FDA's actions. The issues presented are whether the district court correctly dismissed plaintiffs'

claims for lack of standing and whether the relevant agency actions are committed to agency discretion by law.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Statutory and Regulatory Background

The Public Health Service Act generally prohibits the introduction of biological products such as vaccines into interstate commerce absent an approved biologics license application from the FDA. *See* 42 U.S.C. § 262(a)(1)(A), (i)(1). To obtain a license, a manufacturer must submit an application to FDA, which the agency reviews to determine, among other things, whether the product is "safe, pure, and potent." *Id.* § 262(a)(2)(C).

Separately, the Federal Food, Drug, and Cosmetic Act provides that FDA may authorize biological products such as vaccines that are "intended for use in an actual or potential emergency," "[n]otwithstanding" the Public Health Service Act's licensing provisions. 21 U.S.C. § 360bbb-3(a)(1). The Secretary of Health and Human Services may declare that circumstances justifying an emergency use authorization (EUA) exist if, among other circumstances, the Secretary determines that there is a current or impending public health emergency "that involves a biological, chemical, radiological, or nuclear agent or agents, or a disease or condition that may be attributable to such agent or agents." *Id.* § 360bbb-3(b)(1). FDA may then issue an EUA for vaccines or

2

other products intended for use in diagnosing, treating, or preventing the serious or life-threatening disease or condition that caused the emergency. *Id.* § 360bbb-3(c)(1).

To issue an EUA, FDA must find, "based on the totality of scientific evidence . . . , including data from adequate and well-controlled clinical trials, if available," that it is reasonable to believe that the product may be effective and that the product's known and potential benefits outweigh its known and potential risks. 21 U.S.C. § 360bbb-3(c)(2). Congress expressly provided that all "[a]ctions under the authority of" the relevant section of the statute are "committed to agency discretion." *Id.* § 360bbb-3(i).

## B.     Factual and Procedural Background

1. In February 2020, the Secretary of Health and Human Services made a determination of a "public health emergency . . . that involves a novel (new) coronavirus," known as SARS-CoV-2, the virus that causes COVID-19. 85 Fed. Reg. 7316, 7317 (Feb. 7, 2020). Shortly thereafter, the Secretary declared that "circumstances exist justifying the authorization of emergency use of drugs and biological products" under § 360bbb-3(b)(1). 85 Fed. Reg. 18,250, 18,250-51 (Apr. 1, 2020).[1]

---

[1] This determination of a public health emergency and declaration that circumstances exist justifying the authorization of emergency use of drugs and biological products is made under the authority of 21 U.S.C. § 360bbb-3. It is a separate declaration, and under separate authority, from the recently expired declaration of a public health emergency for COVID-19 made under section 319 of the Public Health Service Act. *See* 42 U.S.C. § 247d.

In December 2020, FDA issued two EUAs for vaccines for the prevention of COVID-19: one manufactured by Pfizer, Inc. and BioNTech Manufacturing GmbH that was authorized for use in individuals 16 years of age and older and one manufactured by ModernaTX, Inc. that was authorized for use in individuals 18 years of age and older. *See* 86 Fed. Reg. 5200, 5200, 5204, 5214 (Jan. 19, 2021) (providing notice of EUA issuance). Those EUAs have since been reissued a number of times with updated safety, dosing, and administration information and with changes to the population for which emergency use is authorized. *See* FDA, *Emergency Use Authorization*, https://perma.cc/XKQ8-GUBN (listing EUAs).

In May 2021, plaintiff Children's Health Defense submitted a petition to FDA that asserted that safety concerns required the agency to revoke its EUAs for the then-authorized vaccines and to refrain from licensing COVID-19 vaccines. *See* ROA.1945. FDA denied the petition after detailing the robust scientific record that supported FDA's findings with respect to the safety and effectiveness of the vaccines. *See* ROA.2289-341.

In May 2021, October 2021, and June 2022, FDA revised the Pfizer EUA to expand the authorization to encompass additional age groups: first, individuals 12 through 15 years old; second, individuals 5 through 11 years old; and third, individuals 6 months through 4 years old. *See* ROA.2079-81. And in June 2022, FDA revised the

Moderna EUA to authorize administration of the vaccine to individuals 6 months

through 17 years old. *See* ROA.2189.[2]

On August 23, 2021, FDA approved a license for the Pfizer-BioNTech

vaccine. *See* FDA News Release, *FDA Approves First COVID-19 Vaccine* (Aug. 23,

2021), https://perma.cc/5Q5J-GP9H. On January 31, 2022, FDA approved a license

for the Moderna vaccine. *See* FDA News Release, *FDA Takes Key Action by Approving

Second COVID-19 Vaccine* (Jan. 31, 2022), https://perma.cc/K65B-ZDYY. Currently

the Pfizer-BioNTech vaccine is licensed for use in people aged 12 years and older, and

the Moderna vaccine is licensed for use in people aged 18 years and older. *See* FDA,

Comirnaty Prescribing Information 1, https://perma.cc/M524-ZZ9X; FDA,

Spikevax Prescribing Information 1, https://perma.cc/BNQ6-ANWK.

Since the vaccines' licensure, FDA has issued EUAs for an updated bivalent

formulation of both the Pfizer-BioNTech and Moderna vaccines authorizing their use

in individuals six months in age and older. The monovalent formulations of these

---

[2] In addition to the vaccines at issue in this case, FDA issued EUAs for two other vaccines for the prevention of COVID-19. In February 2021, FDA issued an EUA for a vaccine manufactured by Janssen Biotech, Inc. that was authorized for use in individuals 18 years of age and older. *See* 86 Fed. Reg. 28,608, 28,610, 28,619 (May 27, 2021). The EUA for the Janssen vaccine was revoked in June 2023 in response to Janssen's voluntary request. *See* Letter from Peter Marks, M.D, Ph.D., Director, Center for Biologics Evaluation and Research, to Janssen Biotech, Inc. (June 1, 2023), https://perma.cc/J676-XE42. In July 2022, FDA issued an EUA for a vaccine manufactured by Novavax, Inc. that was authorized for use in individuals 18 years of age and older. *See* 86 Fed. Reg. 52,790, 52,790 (Aug. 29, 2022). That EUA was later revised to include individuals 12 to 17 years of age. *See* FDA, EUA Decision Memorandum (Aug. 19, 2022), https://perma.cc/J3MV-6KDC.

vaccines remain licensed but are no longer authorized for emergency use in the United States; they are thus only approved for use in individuals 12 years and older (Pfizer) or 18 years and older (Moderna). *See generally* FDA, *FDA COVID-19 Vaccine News and Updates*, https://perma.cc/E3VU-JDWF; FDA News Release, *Coronavirus (COVID-19) Update: FDA Authorizes Changes to Simplify Use of Bivalent mRNA COVID-19 Vaccines* (Apr. 18, 2023), https://perma.cc/WY2V-YLYU.

2. In January 2022, plaintiffs Children's Health Defense, Deborah L. Else, and Sacha Dietrich filed this lawsuit. *See* ROA.10. Children's Health Defense is an "organization that has tasked itself with protecting and promoting the health and wellbeing of children." ROA.1948. Else and Dietrich are parents who live in Texas and who do not want their children to receive a COVID-19 vaccination. ROA.10.

After their initial complaint was dismissed for lack of standing, *see* ROA.5, they filed an amended complaint that is now the operative complaint. That amended complaint adds three additional individual plaintiffs—Amy Villella (who lives in Florida) and Jonathan and Rebecca Shour (who live in North Carolina)—who are, like the original individual plaintiffs, parents who do not want their children to receive a COVID-19 vaccination. *See* ROA.1908-09. The amended complaint contains two counts. First, plaintiffs claim that FDA's authorization of the vaccines for emergency use in children violated the APA's reasoned decisionmaking requirements in various ways. *See* ROA.1965-72. Second, plaintiffs seek a declaratory judgment generally

stating that various aspects of the FDA's authorization were unlawful. *See* ROA.1972-73.

The district court again dismissed the complaint for lack of standing, concluding that no plaintiff had adequately pled an injury-in-fact. First, the court rejected the individual plaintiffs' claim of standing based on their fear that their children may be immunized without plaintiffs' consent. The court explained that plaintiffs had "merely allege[d] a speculative threat of harm from vaccination by a non-parent or impending vaccine mandates" and had not properly demonstrated any "substantial risk" that the speculative injury would occur. *See* ROA.2436-38 (quotation omitted). And the court further explained that plaintiffs' fears were especially speculative in this case, because State law in each State where the individual plaintiffs reside further protect plaintiffs' ability to ensure their children do not receive a COVID-19 vaccination without their consent. *See* ROA.2439.

Second, the court rejected the individual plaintiffs' claim of standing based on their alleged exposure to "coercive pressures, false advertising, and propaganda" related to COVID-19 vaccinations and their alleged "collapse of confidence in the FDA." ROA.2440-42 (quotation omitted). The court explained that plaintiffs had "merely alleged a psychological consequence produced by observation of conduct with which one disagrees" and that such an injury "is not the type of harm that is traditionally recognized as providing a basis for a lawsuit in American courts." ROA.2441-42 (quotation omitted). And the court further explained that plaintiffs had

not alleged any concrete impact from their alleged "loss of confidence" in FDA. ROA.2442.

Third, the court rejected plaintiff Children's Health Defense's claim to organizational standing based on a diversion of its resources. The court explained that the organization's allegations that it had expended resources on investigating FDA's actions and on counseling its members and working to inform the public of its views regarding vaccines did not demonstrate the requisite diversion of resources, because the organization "failed to show how [these] efforts" are any different "from its ordinary activities." ROA.2443-44. And the court further explained that Children's Health Defense had also not established that the alleged diversion of resources had "concretely and perceptibly impaired [the organization's] ability to carry out its purpose." ROA.2444 (quotation omitted).

This appeal followed.

## SUMMARY OF ARGUMENT

**I.** The district court correctly dismissed plaintiffs' claims for lack of standing.

**A.** At the outset, the individual plaintiffs fail to identify any cognizable, certainly impending injury-in-fact. Plaintiffs do not provide any facts to support their speculation that some hypothetical third party might, at some hypothetical point in the future and through some hypothetical means, vaccinate their children against their wishes. And plaintiffs' asserted fears of such hypothetical action are particularly speculative given that State law in each of their States of residence generally prohibits

8

administering the EUA-authorized COVID-19 vaccines to plaintiffs' children without their consent. Finally, plaintiffs' claims of harm from bullying or exposure to propaganda are insufficiently substantiated with specific factual allegations, and, regardless, such harms are only psychological injury that does not constitute a cognizable basis for suit.

**B.** Even if the individual plaintiffs could demonstrate some concrete, non-speculative injury-in-fact, their asserted injuries are neither fairly traceable to FDA's challenged conduct nor likely redressable by a favorable decision. When a plaintiff's claimed injury is the result of actions by a third party rather than the defendant, traceability is "substantially more difficult" to establish. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992) (quotation omitted). Such injury will generally only suffice if the challenged conduct has a "determinative or coercive effect" on the third party. *Bennett v. Spear*, 520 U.S. 154, 169 (1997). And here, plaintiffs fail to demonstrate that any of FDA's actions in issuing the COVID-19 vaccine EUAs had any such determinative or coercive effect on the third parties that plaintiffs assert may vaccinate their children or harass or propagandize to them. To the contrary, any such third parties are exercising their own discretion in choosing how to interact with unvaccinated individuals, and any harm they may choose to cause is not directly traceable to FDA's challenged actions.

For similar reasons, plaintiffs' asserted injuries would not be likely redressed by a favorable decision. Plaintiffs generally seek an order staying, vacating, and

remanding the issuance of the EUAs for administering the vaccines to children, as well as a declaration that FDA acted unlawfully. *See* ROA.1972-73. But nothing about such relief would necessarily result in any of the third parties who plaintiffs assert are harassing or bullying them to act any differently.

**C.** In addition, Children's Health Defense has failed to establish any injury-in-fact. Although the organization generally alleges that it has expended resources responding to FDA's conduct—by, for example, counseling its members about vaccines and attempting to educate the public about perceived dangers of vaccines—it has failed to demonstrate either that those activities are meaningfully different from its ordinary activities or that it has had to curtail any other specific projects because it diverted resources to those activities. Without such showings, the organization has failed to establish an injury-in-fact. And Children's Health Defense's attempts to leverage the money it has spent preparing for and pursing this lawsuit likewise do not constitute a cognizable (or a redressable) injury; parties cannot spend their way to standing.

**II.** Plaintiffs' claims against the federal government are independently jurisdictionally barred because the APA does not provide any avenue to challenge actions that are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Here, plaintiffs seek to challenge actions that the government took pursuant to 21 U.S.C. § 360bbb-3 in declaring a public health emergency and issuing EUAs. But Congress has expressly provided that all "[a]ctions under the authority of this section . . . are

committed to agency discretion." 21 U.S.C. § 360bbb-3(i). Thus, plaintiffs cannot

maintain their APA claims challenging those actions.

## STANDARD OF REVIEW

This Court reviews de novo the district court's dismissal for lack of subject

matter jurisdiction of plaintiffs' claims. *Shemwell v. City of McKinney*, 63 F.4th 480, 483

(5th Cir. 2023) (per curiam).

## ARGUMENT

## I.     Plaintiffs Lack Standing to Pursue Their Claims

"The law of Art[icle] III standing is built on a single basic idea—the idea of

separation of powers." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021)

(quotation omitted). "Under Article III, federal courts do not adjudicate hypothetical

or abstract disputes" and "do not exercise general legal oversight of the Legislative

and Executive Branches." *Id.* Instead, to establish standing, a plaintiff must prove

(1) that she has "suffered an injury in fact"; (2) that the injury is "fairly traceable to the

challenged action of the defendant, and not the result of the independent action of

some third party not before the court"; and (3) that it is "likely, as opposed to merely

speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders

of Wildlife*, 504 U.S. 555, 560-61 (1992) (alterations and quotation omitted).

### A.    The Individual Plaintiffs Have Not Alleged Sufficient Injury-in-Fact

1. a. The individual plaintiffs primarily attempt to demonstrate the required injury-in-fact by arguing (at 15-18) that their children may be vaccinated over their objections and that such a vaccination would injure plaintiffs or their children. As the district court correctly concluded, *see* ROA.2438-39, that attempt fails because plaintiffs have failed to allege sufficient facts to demonstrate any non-speculative possibility that their children will be vaccinated against their wishes.

To establish injury-in-fact to satisfy Article III, "allegations of possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (alteration, emphasis, and quotation omitted). Instead, "to ensure that the alleged injury is not too speculative," a plaintiff who wishes to rely on threatened injury to establish standing must demonstrate that a concrete injury is "certainly impending." *Id.* (emphasis and quotation omitted).

Plaintiffs' allegations fail to clear that threshold. FDA itself does not mandate the administration of any vaccinations, including COVID-19 vaccinations. And plaintiffs do not allege that their children are or will be subject to any specific vaccination mandates that might be imposed by third parties. Nor do plaintiffs allege that their children wish to receive a COVID-19 vaccination or have the means or opportunity to receive it against their parents' wishes. Indeed, plaintiffs' opening brief does not identify a single specific alleged fact to suggest that their children may

12

imminently receive the vaccination without their consent. To the contrary, State law in all three of the States in which plaintiffs reside—Florida, North Carolina, and Texas—would generally prohibit administering the EUA-authorized COVID-19 vaccination to plaintiffs' children without plaintiffs' consent. *See* Fla. Stat. § 1014.06(1); N.C. Gen. Stat. § 90-21.5(a1); Tex. Family Code Ann. § 151.001(a)(6).

Moreover, although the Texas-based plaintiffs complain generically (at 15-16) about a fear that some third party may authorize vaccinations for their children, they seem to recognize (at 15 n.6) that Texas law would only permit certain specified non-parents to consent to their children's immunization in limited circumstances where, among other things, the parents are "not available." *See* Tex. Family Code Ann. § 32.101(b). And those plaintiffs fail to identify any specific third party that would be in a position to provide that authorization—much less do they allege that any such third party desires to vaccinate their children (or has the means to do so) or that their children would go along with this hypothetical third party's plan. And although the Shours suggest (at 16-17) that they could be relocated by the Navy—Jonathan Shour's employer—to a different area that might implement vaccination mandates, they do not allege any facts suggesting that any such relocation is imminent. Much less do they allege any facts to suggest that most, or even some or any, of the places where they might be relocated implement a vaccination mandate.

In short, plaintiffs offer nothing more than "unadorned speculation," *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 44 (1976), that some hypothetical third

party might, at some unspecified future time and through some unspecified means, take actions that result in their children's vaccination. That speculation does "not suffice to invoke the federal judicial power." *Id.*

b. Plaintiffs' failure to demonstrate standing is highlighted by their reliance (at 10-12) on *Booth v. Bowser*, 597 F. Supp. 3d 1 (D.D.C. 2022). In that case, the plaintiff parents sought to challenge a District of Columbia law that allowed children 11 years of age or older to themselves consent to receiving vaccinations in certain circumstances, even over their parents' objection. *See id.* at 9. In concluding that two sets of parents had sufficiently alleged an impending injury to establish standing, the district court reviewed the complaints' detailed allegations regarding the likelihood that the parents' children would soon be vaccinated. For example, for one child, L.B., the district court emphasized allegations that "L.B. has said he would take the vaccine if offered it" and that the District had set up a vaccination clinic "inside L.B.'s school." *Id.* at 11-14. And for another child, J.D., the court emphasized allegations that J.D. had "repeatedly told [her father] that she needs to get various vaccines for her school's dance team performances, so that she can attend a summer camp, to secure a summer job, and to attend the college of her choice" and that she had "often communicated her intention to get the vaccine." *Id.* at 15-16. Here, by contrast, plaintiffs fail to allege any such specific facts establishing a similar substantial likelihood that their children will imminently become vaccinated over their objection.

14

Beyond *Booth*, plaintiffs cite (at 12-13) a number of other cases that they claim find standing on similar theories, including where a government agency is allegedly exposing the plaintiff to, or increasing the risk that the plaintiff is exposed to, harmful products or drugs, *Baur v. Veneman*, 352 F.3d 625 (2d Cir. 2003); *Cutler v. Kennedy*, 475 F. Supp. 838 (D.D.C. 1979); *Center for Food Safety v. Price*, No. 17-cv-3833, 2018 WL 4356730 (S.D.N.Y. Sept. 12, 2018); where an agency allegedly increases health-related uncertainty, *New York Public Interest Research Grp. v. Whitman*, 321 F.3d 316 (2d Cir. 2003); and where a parent's medical control over her children's care is allegedly impaired, *Tummino v. Torti*, 603 F. Supp. 2d 519 (E.D.N.Y. 2009).

As the district court correctly recognized in rejecting plaintiffs' reliance on many of these cases, *see* ROA.2439-40, they do not advance plaintiffs' claims of standing. Of course, being exposed to harmful products or having one's right to control medical care curtailed is the sort of harm that theoretically could support injury-in-fact. But here, as explained, plaintiffs have failed to demonstrate any non-speculative risk that their children will, through some unspecified means, be vaccinated against plaintiffs' wishes. They thus have not established the requisite imminent harm.

2. Separately, plaintiffs briefly suggest (at 13-14) that they have suffered injury-in-fact because they or their children have been marginalized or bullied for not being vaccinated and have been exposed to pro-vaccine propaganda, such as images of

Elmo's being vaccinated. But as the district court correctly concluded, *see* ROA.2441-42, that alleged psychological injury is also not sufficient to satisfy Article III.

As an initial matter, plaintiffs fail to identify any specific factual allegations in the record that would support their claim that their children have, for example, been substantially harassed by other children because of their unvaccinated status. *See* Br. 13-14. In any event, the sort of psychological harm that plaintiffs attempt to invoke fails Article III's requirement "that the plaintiff's injury in fact be concrete—that is, real, and not abstract." *TransUnion*, 141 S. Ct. at 2204 (quotation omitted). To satisfy that standard, an injury must bear "a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts"—for example, "traditional tangible harms, such as physical harms and monetary harms," or "traditionally recognized" intangible harms, such as "disclosure of private information" or infringement of Constitutional rights. *Id.* (quotation omitted).

But plaintiffs do not even attempt to identify any historical analogy that could support the argument that the psychological harm they (or their children) assertedly experience from being exposed to "vaccine propaganda" or the "looming threat of being pushed out of society," Br. 14, constitutes a sufficiently concrete harm to satisfy Article III. The district court rejected plaintiffs' claim to standing to this basis. *See* ROA.2441-42. Plaintiffs' failure to develop any argument to rebut the district court's conclusion in their opening brief means that they have forfeited any such challenge. *See Owens v. Circassia Pharm., Inc.*, 33 F.4th 814, 824 n.4 (5th Cir. 2022).

16

In any event, the district court's conclusion was correct. Plaintiffs fail to identify any specific allegations of psychologically harmful conduct directed at them. And to the extent that their assertions of injury rest on abstract claims of psychological harm from, for example, encounters with pro-vaccination media or with pro-vaccination members of their community, the district court correctly recognized that the Supreme Court has rejected reliance on claims of such abstract psychological injury. As the Supreme Court has concluded, "the psychological consequence presumably produced by observation of conduct with which one disagrees" is "not an injury sufficient to confer standing." *Valley Forge Christian Coll. v. Americans United for Separation of Church & State*, 454 U.S. 464, 485 (1982). So too here.

### B.     Even If the Individual Plaintiffs Could Show Injury-in-Fact, Their Injuries Would Not Be Traceable to FDA or Redressed by a Favorable Decision

Even if the individual plaintiffs could demonstrate some substantial likelihood that one of their children will be vaccinated against their wishes—or even if their asserted harms of bullying or exposure to pro-vaccine messaging constituted a cognizable injury—their attempt to demonstrate standing would still fall short. Plaintiffs' claims in this case are limited to challenging FDA's issuance of EUAs for COVID-19 vaccines. But their claimed injuries are not fairly traceable to FDA's challenged conduct, nor is it likely that any favorable decision on those claims would redress their injuries.

17

1. The individual plaintiffs have failed to demonstrate that their claimed injuries are fairly traceable to the conduct that they challenge—FDA's issuance of EUAs for vaccines. As the Supreme Court has repeatedly emphasized, to suffice for standing, a plaintiff's injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560-61 (alterations and quotation omitted). The Supreme Court has further admonished that, in pleading traceability, "much more is needed" when an injury "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *Id.* at 562 (quotation omitted). In short, "when the plaintiff is not himself the object of the government action or inaction he challenges," but instead complains of an injury that is mediated through the government's regulation of somebody else, demonstrating standing to pursue claims against the government will ordinarily be "substantially more difficult." *Id.* (quotation omitted). Such mediated injury will generally only suffice for standing purposes if the challenged government conduct has a "determinative or coercive effect upon the action" that directly causes the plaintiff's injury. *Bennett v. Spear*, 520 U.S. 154, 169 (1997).

Applying these principles, this Court has rejected efforts to bring suit when the plaintiffs are directly harmed by third parties' independent decisions, even when those plaintiffs argued that the defendant's actions created (or failed to properly ameliorate)

the conditions that engendered the harm. For example, in *Rivera v. Wyeth-Ayerst Laboratories*, plaintiffs—a class of patients and insurers who had used or reimbursed users of a drug—sought to sue the drug's manufacturer, alleging that the drug was defective and the manufacturer had failed to properly warn of the risks associated with the drug. 283 F.3d 315, 317 (5th Cir. 2002). This Court concluded that they had failed to establish that their asserted injuries (the money they had paid for the drug) were fairly traceable to the manufacturer, because a "physician had to make an independent medical judgment to prescribe" the drug before any patient could take it. *Id.* at 321. And this Court determined that plaintiffs had failed to adduce any facts to demonstrate that had the manufacturer "acted 'lawfully' (produced a safer drug or provided more extensive warnings), [their] physicians would not have prescribed—*and* the plaintiffs would not have purchased"—the drug. *Id.*

Similarly, in *Inclusive Communities Project, Inc. v. Department of Treasury*, a nonprofit organization sought to sue the federal government, alleging that the government had improperly "abdicated their [statutory] duties to" implement a regulatory program "in a manner that furthers fair housing" and that the abdication had led to increased residential segregation and had caused the organization to "expend[] greater resources to help place minority families in acceptable housing units." 946 F.3d 649, 654, 656 (5th Cir. 2019). This Court rejected that standing claim, concluding that the alleged injuries were not fairly traceable to the federal government. Although the federal government had power to regulate the relevant low-income housing program, the

19

decisions to "commission [low-income housing] projects or determine where they should be sited" were mediated through state housing authorities and private sponsors, who exercised their own discretion in implementing the program. *See id.* at 657.

And in *E.T. v. Paxton*, this Court rejected an attempt to sue the Texas Attorney General, when the plaintiffs alleged that his enforcement of the Governor's executive order prohibiting school districts from imposing mask mandates had injured them by increasing their "risk of contracting COVID-19 and suffering complications." 41 F.4th 709, 718 (5th Cir. 2022). This Court explained that the plaintiffs' risk of contracting COVID-19 "could be attributed to any number of variables that have nothing to do with mask mandates," including the "innumerable differences in the way plaintiffs' schools—each an independent actor—have chosen to address COVID-19." *Id.* at 720. Thus, plaintiffs could not fairly trace their injury to the Attorney General's enforcement of the executive order. *Id.*

In addition, several courts have dismissed on standing grounds claims quite factually similar to those asserted here. Particularly analogous is the Sixth Circuit's recent decision in *Children's Health Defense v. U.S. FDA*, No. 21-6203, 2022 WL 2704554 (6th Cir. July 12, 2022), *cert. denied*, 143 S. Ct. 784 (2023). There, a group of plaintiffs who claimed to be injured by the Department of Defense's decision to implement a vaccination mandate brought suit against FDA, contending that FDA had illegally licensed the Pfizer-BioNTech vaccine while simultaneously extending its

EUA. *See id.* at *1-2. In affirming the district court's dismissal for lack of standing, the

Sixth Circuit explained that "plaintiffs' alleged injuries are not fairly traceable to

FDA's actions" because "FDA has not required the general public to be vaccinated,

FDA has not required military servicemembers to be vaccinated, and FDA does not

control the military." *Id.* at *3-4. In short, FDA has "not imposed any kind of

mandate affecting the" plaintiffs, and so their alleged injuries stemmed only from the

Department of Defense's independent decision to adopt a vaccination requirement.

*Id.* Other cases have similarly recognized the distinction between requirements that

individuals be vaccinated, on the one hand, and FDA's authorization of the vaccine,

on the other. *See, e.g., Null v. U.S. FDA*, No. 09-cv-1924, 2009 WL 10744069, at *3

(D.D.C. Nov. 10, 2009) (holding that New York State vaccine mandate for nurses

"cannot be attributed to the federal government . . . just because the federal

government approved a vaccine as safe for human consumption").

    The allegations in this case fare no better than those in which standing has

previously been held to be lacking. Nowhere do plaintiffs allege or argue that they are

the direct subject of any federal government regulation. Instead, they allege injury

based on the actual or speculated acts of third parties, who plaintiffs fear might

vaccinate their children or who plaintiffs assert are bullying them or exposing them to

propaganda. Those alleged injuries would (if they were not speculative and non-

cognizable) be indisputably directly traceable not to FDA's challenged conduct but

instead to third parties' own independent decisions to vaccinate plaintiffs' children or

expose them to propaganda or treat them differently as a result of their unvaccinated status.

Put another way, plaintiffs have not (and could not) allege that any portion of FDA's challenged conduct—the issuance of the EUAs—directs third parties to vaccinate plaintiffs' children or harass or bully plaintiffs or children. Thus, third parties stand directly between plaintiffs and the government's challenged conduct, and plaintiffs' asserted harms are not fairly traceable to the federal government. And as noted above, other courts considering similar claims have reached the same conclusion.

2. In addition, the individual plaintiffs lack standing to pursue their claims against the federal government for the independent, though related, reason that they have failed to demonstrate that their claimed harms would be redressed by the relief they seek.

As explained, to establish standing, a plaintiff must demonstrate that it is "likely, as opposed to merely speculative, that the injury" complained of "will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (quotation omitted). As with traceability, redressability is "ordinarily substantially more difficult to establish" where, as in this case, "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*." *Id.* at 561-62 (quotation omitted).

Here, the individual plaintiffs' claimed injuries relate to fears that their children will be vaccinated and annoyance at being harassed or exposed to different viewpoints by third parties. Conversely, the relief they seek is generally limited to "a stay, a vacatur and remand" of the decision to issue EUAs covering administration of the vaccines to children, and a "declaratory judgment" generally stating that FDA's conduct was illegal. *See* ROA.1972-73. But even if the courts were to hear this lawsuit and hold for plaintiffs—and grant their requested relief—it is "unclear what effect" that relief "would have on the conduct of" the third parties who plaintiffs assert are injuring them. *Inclusive Cmty. Project*, 946 F.3d at 657; *cf. Children's Health Def.*, 2022 WL 2704554, at *4 (concluding that an order requiring FDA to revoke its licensure of the Pfizer-BioNTech vaccine would not require the Department of Defense to revoke its own vaccination mandate and thus would "not redress [plaintiffs'] alleged injuries"). Indeed, plaintiffs have not even attempted to demonstrate that third parties like school administrators and other schoolchildren would likely react to any relief in this suit by altering their behavior and, for example, ceasing to tease plaintiffs' children over their unvaccinated status.

Plaintiffs also briefly suggest that they seek to "enjoin any further marketing or promotion" of the vaccines to children. ROA.1973. But FDA does not market vaccines. And plaintiffs fail to explain how any such injunction would be appropriate relief on their claims, which are limited to the EUA issuance, or would redress their asserted injuries in any event.

### C.     Children's Health Defense Lacks Organizational Standing

As the district court correctly concluded, *see* ROA.2443-44, Children's Health Defense fails to establish any injury-in-fact that could support its organizational standing to sue in its own right.[3] As that court explained, it is not enough for Children's Health Defense to rely on generalized assertions that it has spent resources in response to FDA's conduct. *See* ROA.2444. Instead, to establish injury-in-fact, Children's Health Defense would need to show that "it had diverted significant resources to counteract [FDA's] conduct" such that FDA has "significantly and perceptibly impaired" Children's Health Defense's "ability to" engage in its usual activities. *NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010) (quotation omitted). This showing "must be concrete and demonstrable"; a mere "setback to the organization's abstract social interests" is not enough. *Id.* (quotation omitted).

In attempting to make the necessary showing, Children's Health Defense generally takes two tacks in this Court. First, it suggests (at 21-22) that it has spent resources working with its members to address coercion or pressure that they feel and

---

[3] The district court also correctly concluded that Children's Health Defense lacks associational standing because it had not identified any member who independently possessed Article III standing. *See* ROA.2442 ("Because the Court has determined that the individual Plaintiffs, the only identified members of [Children's Health Defense], failed to show that they independently possess Article III standing, the Court finds that [Children's Health Defense] lacks associational standing."). In their opening brief, Children's Health Defense appears to concede that its associational standing in this lawsuit turns on whether any individual plaintiff member has standing. *See* Br. 9-10. And, as explained, each individual plaintiff has failed to demonstrate standing.

trying to educate the public about perceived dangers of vaccination. Second, Children's Health Defense states (at 21-23) that it has spent resources investigating FDA's actions to prepare for litigation and filing its citizen petition. Neither of those purported injuries is sufficient to satisfy Article III.

First, to the extent that Children's Health Defense claims injuries related to spending resources addressing the perceived harms of its members, those injuries are derivative of the members' own claimed injuries. But as explained, although individual members of Children's Health Defense are plaintiffs, none of them has established any concrete, cognizable injury-in-fact. And any claimed harm from third party actions is not traceable to the FDA's challenged actions or redressable in this suit. *See supra* pp. 11-23. Children's Health Defense cannot bootstrap its way to standing by spending resources on addressing claimed harms that do not themselves support standing.

Regardless, Children's Health Defense fails to show how its activities working with its members and educating the public "differ from [its] routine" activities. *City of Kyle*, 626 F.3d at 238. Indeed, to the contrary, the organization alleges that its overall mission includes "eliminat[ing] harmful exposures" to vaccines and "establish[ing] safeguards to prevent future harm" to children. ROA.1948 (quotation omitted). Activities like working with members to support their decision not to have their children vaccinated and educating the public about asserted harms from vaccines appear to fit comfortably within the usual and ordinary activities that the organization

25

engages in. Moreover, Children's Health Defense "ha[s] not identified any specific projects that [it] had to put on hold or otherwise curtail in order to respond to" the issuance of the EUAs; instead, it has "only conjectured that the resources that [it] had devoted to" the EUAs "could have been spent on other unspecified [Children's Health Defense] activities." *City of Kyle*, 626 F.3d at 238-39. Such abstract allegations are not, as this Court made clear in *City of Kyle*, sufficient to "demonstrate[] that the diversion of resources here concretely and perceptibly impaired [Children's Health Defense's] ability to carry out its purpose." *Id.* at 239 (quotation omitted).

Second, Children's Health Defense's attempt to rely on its prelitigation and administrative petition costs also fails. As an initial matter, the organization fails to explain how activities like investigating the safety of vaccines and petitioning FDA to revoke EUAs "differ from [its] routine" activities. *City of Kyle*, 626 F.3d at 238. Regardless, an organizational plaintiff—like any other plaintiff—cannot spend its way to standing through a lawsuit; instead, the organization "must demonstrate that the purportedly illegal action increases the resources the group must devote to programs independent of its suit challenging the action." *Online Merchs. Guild v. Cameron*, 995 F.3d 540, 547 (6th Cir. 2021) (quotation omitted); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998) ("Obviously, . . . a plaintiff cannot achieve standing to litigate a substantive issue by bringing suit for the cost of bringing suit."). And in any event, Children's Health Defense fails to explain how these costs—which were

previously incurred but are not ongoing—would be redressed by any favorable decision.

Plaintiffs also briefly suggest that they have suffered some sort of "procedural injury" that satisfies the "zone of interests standard" applied in APA cases. Br. 25-27 (quotation omitted). As plaintiffs seem to recognize (at 27), however, alleging a procedural injury—or bringing a procedural claim under the APA—does not relieve plaintiffs of establishing the "irreducible constitutional minimum of standing," which includes a concrete, traceable, redressable injury. *Lujan*, 504 U.S. at 560; *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing."). As explained, plaintiffs fail to meet that burden.

## II.    In Any Event, the Relevant Actions Are Committed to Agency Discretion by Law

Even if some or all plaintiffs had standing to pursue their claims challenging FDA's issuance of EUAs, those claims would fail at the threshold because FDA's actions in issuing EUAs are committed to agency discretion by law.

Under this Court's precedents, this limitation on judicial review is jurisdictional; thus, federal courts lack subject matter jurisdiction over a matter challenging agency action that is committed to the agency's discretion. *See Ellison v. Connor*, 153 F.3d 247, 251, 257 (5th Cir. 1998). In granting FDA authority to issue EUAs, Congress

expressly provided that all "[a]ctions under the authority of this section . . . are committed to agency discretion." 21 U.S.C. § 360bbb-3(i). Congress thus could not have been clearer that determinations about EUAs are matters that plaintiffs may not challenge through an APA suit.

But plaintiffs' claims are directed at challenging the declaration of an emergency justifying EUAs, *see* ROA.1966-67, and the issuance of EUAs without (in plaintiffs' view) sufficient reasoned explanation, *see* ROA.1967-72. These are undeniably actions that the Secretary and FDA took under the authority of § 360bbb-3. *See* 21 U.S.C. § 360bbb-3(b) (providing for emergency declarations); *id.* § 360bbb-3(c) (providing authority to issue EUAs). Thus, plaintiffs' claims challenge actions committed to agency discretion by law and the courts lack jurisdiction to review them. *See Association of Am. Physicians & Surgeons v. FDA*, No. 20-1784, 2020 WL 5745974, at *3 (6th Cir. Sept. 24, 2020) ("[E]mergency-use authorizations are exempt from review under the APA.").

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

*Of Counsel:*

SAMUEL BAGENSTOS
  *General Counsel, Department of Health and Human Services*

MARK RAZA
  *Chief Counsel*

WENDY VICENTE
  *Deputy Chief Counsel, Litigation*

JAMES ALLRED
  *Associate Chief Counsel*

  *U.S. Food and Drug Administration*

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney General*

JAIME ESPARZA
  *United States Attorney*

DANIEL TENNY

  *s/ Sean R. Janda*
SEAN R. JANDA
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7260*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3388*
  *sean.r.janda@usdoj.gov*

July 2023

**CERTIFICATE OF SERVICE**

I hereby certify that on July 17, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system.

*s/ Sean R. Janda*
Sean R. Janda

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,814 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Sean R. Janda*
Sean R. Janda

**ADDENDUM**

# TABLE OF CONTENTS

21 U.S.C. § 360bbb-3 ............................................................................................A1

**21 U.S.C. § 360bbb-3**

**§ 360bbb-3. Authorization for medical products for use in emergencies**

**(a) In general**

**(1) Emergency uses**

Notwithstanding any provision of this chapter and section 351 of the Public Health Service Act [42 U.S.C. 262], and subject to the provisions of this section, the Secretary may authorize the introduction into interstate commerce, during the effective period of a declaration under subsection (b), of a drug, device, or biological product intended for use in an actual or potential emergency (referred to in this section as an "emergency use").

**(2) Approval status of product**

An authorization under paragraph (1) may authorize an emergency use of a product that—

(A) is not approved, licensed, or cleared for commercial distribution under section 355, 360(k), 360b, or 360e of this title or section 351 of the Public Health Service Act [42 U.S.C. 262] or conditionally approved under section 360ccc of this title (referred to in this section as an "unapproved product"); or

(B) is approved, conditionally approved under section 360ccc of this title, licensed, or cleared under such a provision, but which use is not under such provision an approved, conditionally approved under section 360ccc of this title, licensed, or cleared use of the product (referred to in this section as an "unapproved use of an approved product").

**(3) Relation to other uses**

An emergency use authorized under paragraph (1) for a product is in addition to any other use that is authorized for the product under a section of this chapter or the Public Health Service Act [42 U.S.C. 201 et seq.] referred to in paragraph (2)(A).

**(4) Definitions**

For purposes of this section:

(A) The term "biological product" has the meaning given such term in section 351 of the Public Health Service Act [42 U.S.C. 262].

(B) The term "emergency use" has the meaning indicated for such term in paragraph (1).

(C) The term "product" means a drug, device, or biological product.

(D) The term "unapproved product" has the meaning indicated for such term in paragraph (2)(A).

(E) The term "unapproved use of an approved product" has the meaning indicated for such term in paragraph (2)(B).

## (b) Declaration of emergency or threat justifying emergency authorized use

### (1) In general

The Secretary may make a declaration that the circumstances exist justifying the authorization under this subsection for a product on the basis of—

(A) a determination by the Secretary of Homeland Security that there is a domestic emergency, or a significant potential for a domestic emergency, involving a heightened risk of attack with a biological, chemical, radiological, or nuclear agent or agents;

(B) a determination by the Secretary of Defense that there is a military emergency, or a significant potential for a military emergency, involving a heightened risk to United States military forces, including personnel operating under the authority of title 10 or title 50, of attack with—

(i) a biological, chemical, radiological, or nuclear agent or agents; or

(ii) an agent or agents that may cause, or are otherwise associated with, an imminently life-threatening and specific risk to United States military forces;

(C) a determination by the Secretary that there is a public health emergency, or a significant potential for a public health emergency, that affects, or has a significant potential to affect, national security or the health and security of United States citizens living abroad, and that involves a biological, chemical, radiological, or nuclear agent or agents, or a disease or condition that may be attributable to such agent or agents; or

(D) the identification of a material threat pursuant to section 319F–2 of the Public Health Service Act [42 U.S.C. 247d–6b] sufficient to affect national security or the health and security of United States citizens living abroad.

### (2) Termination of declaration

#### (A) In general

A declaration under this subsection shall terminate upon the earlier of—

(i) a determination by the Secretary, in consultation as appropriate with the Secretary of Homeland Security or the Secretary of Defense, that the circumstances described in paragraph (1) have ceased to exist; or

(ii) a change in the approval status of the product such that the circumstances described in subsection (a)(2) have ceased to exist.

**(B) Disposition of product**

If an authorization under this section with respect to an unapproved product ceases to be effective as a result of a termination under subparagraph (A) of this paragraph, the Secretary shall consult with the manufacturer of such product with respect to the appropriate disposition of the product.

**(3) Advance notice of termination**

The Secretary shall provide advance notice that a declaration under this subsection will be terminated. The period of advance notice shall be a period reasonably determined to provide—

(A) in the case of an unapproved product, a sufficient period for disposition of the product, including the return of such product (except such quantities of product as are necessary to provide for continued use consistent with subsection (f)(2)) to the manufacturer (in the case of a manufacturer that chooses to have such product returned); and

(B) in the case of an unapproved use of an approved product, a sufficient period for the disposition of any labeling, or any information under subsection (e)(2)(B)(ii), as the case may be, that was provided with respect to the emergency use involved.

**(4) Publication**

The Secretary shall promptly publish in the Federal Register each declaration, determination, and advance notice of termination under this subsection.

**(5) Explanation by Secretary**

If an authorization under this section with respect to an unapproved product or an unapproved use of an approved product has been in effect for more than 1 year, the Secretary shall provide in writing to the sponsor of such product an explanation of the scientific, regulatory, or other obstacles to approval, licensure, or clearance of such product or use, including specific actions to be taken by the Secretary and the sponsor to overcome such obstacles.

**(6) Military emergencies**

In the case of a determination described in paragraph (1)(B), the Secretary shall determine, within 45 calendar days of such determination, whether to make a declaration under paragraph (1), and, if appropriate, shall promptly make such a declaration.

**(c) Criteria for issuance of authorization**

The Secretary may issue an authorization under this section with respect to the emergency use of a product only if, after consultation with the Assistant Secretary for Preparedness and Response, the Director of the National Institutes of Health, and the Director of the Centers for Disease Control and Prevention (to the extent feasible and appropriate given the applicable circumstances described in subsection (b)(1)), the Secretary concludes—

(1) that an agent referred to in a declaration under subsection (b) can cause a serious or life-threatening disease or condition;

(2) that, based on the totality of scientific evidence available to the Secretary, including data from adequate and well-controlled clinical trials, if available, it is reasonable to believe that—

(A) the product may be effective in diagnosing, treating, or preventing—

(i) such disease or condition; or

(ii) a serious or life-threatening disease or condition caused by a product authorized under this section, approved or cleared under this chapter, or licensed under section 351 of the Public Health Service Act [42 U.S.C. 262], for diagnosing, treating, or preventing such a disease or condition caused by such an agent; and

(B) the known and potential benefits of the product, when used to diagnose, prevent, or treat such disease or condition, outweigh the known and potential risks of the product, taking into consideration the material threat posed by the agent or agents identified in a declaration under subsection (b)(1)(D), if applicable;

(3) that there is no adequate, approved, and available alternative to the product for diagnosing, preventing, or treating such disease or condition;

(4) in the case of a determination described in subsection (b)(1)(B)(ii), that the request for emergency use is made by the Secretary of Defense; and

(5) that such other criteria as the Secretary may by regulation prescribe are satisfied.

. . .

**(e) Conditions of authorization**

**(1) Unapproved product**

**(A) Required conditions**

With respect to the emergency use of an unapproved product, the Secretary, to the extent practicable given the applicable circumstances described in subsection (b)(1), shall, for a person who carries out any activity for which the authorization is issued, establish such conditions on an authorization under this section as the Secretary finds necessary or appropriate to protect the public health, including the following:

(i) Appropriate conditions designed to ensure that health care professionals administering the product are informed—

(I) that the Secretary has authorized the emergency use of the product;

(II) of the significant known and potential benefits and risks of the emergency use of the product, and of the extent to which such benefits and risks are unknown; and

(III) of the alternatives to the product that are available, and of their benefits and risks.

(ii) Appropriate conditions designed to ensure that individuals to whom the product is administered are informed—

(I) that the Secretary has authorized the emergency use of the product;

(II) of the significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown; and

(III) of the option to accept or refuse administration of the product, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks.

(iii) Appropriate conditions for the monitoring and reporting of adverse events associated with the emergency use of the product.

(iv) For manufacturers of the product, appropriate conditions concerning recordkeeping and reporting, including records access by the Secretary, with respect to the emergency use of the product.

**(B) Authority for additional conditions**

With respect to the emergency use of an unapproved product, the Secretary may, for a person who carries out any activity for which the authorization is issued, establish such conditions on an authorization under this section as the Secretary finds necessary or appropriate to protect the public health, including the following:

(i) Appropriate conditions on which entities may distribute the product with respect to the emergency use of the product (including limitation to distribution by government entities), and on how distribution is to be performed.

(ii) Appropriate conditions on who may administer the product with respect to the emergency use of the product, and on the categories of individuals to whom, and the circumstances under which, the product may be administered with respect to such use.

(iii) Appropriate conditions with respect to collection and analysis of information concerning the safety and effectiveness of the product with respect to the use of such product during the period when the authorization is in effect and a reasonable time following such period.

(iv) For persons other than manufacturers of the product, appropriate conditions concerning recordkeeping and reporting, including records access by the Secretary, with respect to the emergency use of the product.

. . .

**(i) Actions committed to agency discretion**

Actions under the authority of this section by the Secretary, by the Secretary of Defense, or by the Secretary of Homeland Security are committed to agency discretion.

. . .

**(k) Relation to other provisions**

If a product is the subject of an authorization under this section, the use of such product within the scope of the authorization shall not be considered to constitute a clinical investigation for purposes of section 355(i), 360b(j), or 360j(g) of this title or any other provision of this chapter or section 351 of the Public Health Service Act [42 U.S.C. 262].